IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA19-115

Filed: 31 December 2020

Guilford County, No. 17 CRS 75007

STATE OF NORTH CAROLINA

v.

DESMIN TARON MCCANTS, Defendant.

Appeal by Defendant from judgment entered 2 August 2018 by Judge Stanley L. Allen in Superior Court, Guilford County. Heard in the Court of Appeals 3 September 2019.

*Attorney General Joshua H. Stein, by Assistant Attorney General Andrew L. Hayes, for the State.*

*Appellate Defender Glenn Gerding, by Assistant Appellate Defender Katherine Jane Allen, for Defendant-Appellant.*

McGEE, Chief Judge.

Desmin Taron McCants ("Defendant") appeals from a judgment entered upon his guilty plea following denial of his motion to suppress. Defendant argues that the trial court erred by denying his motion to suppress evidence discovered during a warrantless search of his premises conducted pursuant to a non-statutory condition added to his mandatory post-release supervision. We agree and reverse the 2 August 2018 order denying Defendant's motion to suppress, vacate the 2 August 2018 judgment entered on Defendant's *Alford* plea, and remand for entry of an order

granting Defendant's motion to suppress and any additional proceedings not inconsistent with this opinion.

## I. Factual and Procedural History

Defendant was convicted of assault with a deadly weapon with intent to kill ("AWDWIK") on 14 August 2014 for an incident involving discharging a firearm into occupied property that occurred on 13 October 2013, when Defendant was nineteen years old. Several additional convictions for crimes Defendant had committed over a four-month period in 2013 were consolidated for judgment with Defendant's AWDWIK conviction. AWDWIK is a Class E felony and, having no prior convictions, Defendant was a prior record level I—thereby subjecting Defendant to either active or intermediate punishment. Defendant was given intermediate punishment, meaning that Defendant's active sentence was suspended and he was placed on supervised probation. The trial court included as part of Defendant's intermediate punishment special probation, or a "split-sentence," meaning that Defendant would serve a period of incarceration not to exceed one-quarter of his maximum imposed sentence period, with the remaining time being a probationary period consisting of regular supervised probation. N.C.G.S. § 15A-1351(a) (2017).

Just over seven months into Defendant's period of supervised probation, he was charged for possession of marijuana with intent to sell. Defendant was convicted on this charge on 1 August 2016, his probation for the 14 August 2014 convictions

was revoked, and his sentences were activated. Defendant was initially transferred from jail and admitted into the prison system on 31 August 2016. Defendant was released from prison on 31 March 2017, and placed on one year mandatory post-release supervision ("PRS"), to run from 1 April 2017 to 1 April 2018. Conditions of PRS are governed by N.C.G.S. § 15A-1368.4 (2017), and a special commission (the "Commission") that is a part of the Department of Public Safety ("DPS") has been delegated authority by the General Assembly to decide which conditions authorized by N.C.G.S. § 15A-1368.4 to impose for every prisoner subject to PRS. N.C.G.S. § 143B-720(a) (2017) ("There is hereby created a Post-Release Supervision and Parole Commission of the Division of Adult Correction and Juvenile Justice [('DAC')] of [DPS.]"); N.C.G.S. § 15A-1368(b) (2017) ("The Post-Release Supervision and Parole Commission, as authorized in Chapter 143[B] of the General Statutes, shall administer post-release supervision as provided in this Article.").[1] DPS sets out its main rules and procedures for supervising PRS supervisees, parolees, and probationers in two policy manuals: "North Carolina Department of Public Safety, Division of Adult Correction and Juvenile Justice, Community Corrections, Policy & Procedures" (April 1, 2019) ("DPS Corrections") (www.ncdps.gov/Adult-Corrections/Prisons/Policy-Procedure-Manual); and "State of North Carolina Department of Public Safety, Prisons, Policy & Procedures," (June 6, 2019) ("DPS

---

[1] Although the statute states "as authorized in Chapter 143," it is actually Chapter 143B that contains the relevant provisions. *See* N.C.G.S. § 15A-1368(b).

Prisons"—along with DPS Corrections, "DPS Policy" or "the Policy") (https://files.nc.gov/ncdps/C.1500_Inmate_Release_Proc_06_06_19.pdf).

Upon release, Defendant moved into his mother's home (the "Home"), inhabited by Defendant's mother, Defendant's uncle and, at least at times, Defendant's girlfriend. Two witnesses testified at Defendant's suppression hearing challenging the warrantless search of the Home where he was residing. This testimony provides most of the alleged facts relevant to this appeal. The State's first witness was Defendant's supervising PRS officer, Nicole Patterson ("Officer Patterson"), and the State's second witness was Kevin Gibson ("Chief Gibson"), who testified that he was one of the "chief probation/parole officer[s] in the Guilford County Greensboro office." Chief Gibson testified that he supervised "a unit of eight officers," and that he "work[ed] in the [Greensboro] office with Officer Patterson[,]" but Chief Gibson did not specify if Officer Patterson was one of the eight officers he supervised.

Officer Patterson testified that three days after Defendant's release, on 4 April 2017, she went to the Home to conduct a "home visit" pursuant to a condition of Defendant's PRS. *See* N.C.G.S. § 15A-1368.4(e)(6) (stating imposition of this controlling condition "[p]ermit[s] a [PRS] officer to visit at reasonable times at the supervisee's home or elsewhere"). Although not specifically authorized by the plain language of N.C.G.S. § 15A-1368.4(e)(6), on this "home visit," Officer Patterson,

pursuant to the Policy, conducted what she testified to as a "warrantless search" of Defendant's bedroom, as well as the main common areas of the Home. Officer Patterson testified that she limited her warrantless search of the Home to "plain-view," meaning she looked through the personal possessions of the home's residents that were visible without her having to move or open anything. Officer Patterson testified that she did not observe anything suspicious during her 4 April 2017 warrantless search. Pursuant to the Policy, Officer Patterson did note the layout of the Home and drew a general diagram of the Home to assist in future warrantless searches. DPS Corrections, Ch. C, § .0202.

Based upon factors that will be discussed later, the Policy appears to have either permitted or required warrantless searches of Defendant's residence, including thorough searches of closed areas and containers. According to testimony, Defendant was labeled a "high-risk offender" based upon DPS guidelines, and he was also "verified" as a member of the "Folk Nation" gang in 2016, while he was in prison. Both of these determinations, made pursuant to the Policy, subjected Defendant to warrantless searches of his residence. The State's testimony also indicated that, pursuant to the Policy, *all* PRS supervisees were subject to at least one warrantless search of their residences within ninety days of release and, further, that the Post-Release Supervision and Parole Commission ("the Commission") imposed as a condition of his PRS that Defendant submit to warrantless searches of his premises.

The record does not indicate whether the Commission specifically based its imposition of the residential warrantless search condition on Defendant's "high-risk offender" status, or his status as a "validated" gang "member."

The trial court found that on 11 May 2017, Officer Patterson requested the Home be included in a large "joint search operation" or "operational search"— Operation Arrow – that had already been planned and scheduled to occur on 11 May 2017, for the purpose of conducting warrantless searches of the residences of multiple Guilford County PRS supervisees, parolees, and probationers. Chief Gibson had been active in organizing Operation Arrow with other DPS personnel, as well as federal and local law enforcement. Chief Gibson testified that on 11 May 2017, his "duties . . . [were as] part of a joint search operation held . . . in Guilford County . . . [and that] the target was searching high-risk offenders and offenders that were validated gang members[,]" "and also to insure that they were compliant with the terms of their supervision which, in this particular case, was not to possess a firearm, . . . not to possess any type of illegal drugs, contraband or stolen goods." "We were proceeding to various residences in Guilford County to conduct searches on various individuals."

As a part of Operation Arrow, an unannounced warrantless and suspicionless search of the Home was conducted on 11 May 2017, and a handgun was located in the cabinet portion of the bedside table in Defendant's bedroom. As a result, Defendant was arrested and charged with possession of a firearm by a felon, along

with violating conditions of his PRS. Defendant moved to suppress the handgun as the fruit of an illegal warrantless search. The suppression hearing was conducted on 31 July – 1 August 2018, and the trial court denied Defendant's motion to suppress by order entered 2 August 2018. Defendant agreed to enter an *Alford* plea for the charge of possession of a firearm by a felon, and judgment was entered on 2 August 2018, in which Defendant expressly preserved his right to appeal the denial of his motion to suppress. Defendant appeals.

## II. Analysis

In this case, Defendant argues that "the trial court erred in denying [Defendant's] motion to suppress because the warrantless search of [his] home violated North Carolina law and the Fourth Amendment." We agree.

### A. *Standard of Review*

> When a defendant in a criminal prosecution makes a motion to suppress evidence obtained by means of a warrantless search, the State has the burden of showing, at the suppression hearing, "how the [warrantless search] was exempted from the general constitutional demand for a warrant."

*State v. Phillips*, 151 N.C. App. 185, 188, 565 S.E.2d 697, 700 (2002) (citations omitted). "In reviewing the trial court's order following a motion to suppress, we are bound by the trial court's findings of fact if such findings are supported by competent evidence in the record; but the conclusions of law are fully reviewable on appeal." *State v. Smith*, 346 N.C. 794, 797, 488 S.E.2d 210, 212 (1997) (citations omitted).

"The trial court's conclusion of law that [no constitutional error warrants the suppression of evidence] is a fully reviewable legal question." *State v. Hyde*, 352 N.C. 37, 45, 530 S.E.2d 281, 288 (2000) (citation omitted).

B. *Defendant's Argument*

Defendant argues that the denial of his motion to suppress was error because the "warrantless search of his home was neither authorized by North Carolina law nor based on any established exception to the warrant requirement[,]" "and was otherwise unlawful under the Fourth Amendment and Art. I § 20[.]" Specifically, Defendant argues that the General Assembly has not given DPS the authority to require, or power to conduct, warrantless searches of the residences of PRS supervisees, like him, who are not subject to the search provisions of N.C.G.S. § 15A-1368.4(b1); Defendant's alleged consent was neither knowing nor voluntary and, therefore, cannot make lawful an otherwise unlawful warrantless search; and the search was not "reasonably related to his supervision" as required by the statutes authorizing warrantless searches of PRS supervisees, parolees, and probationers.

C. *Fourth Amendment and Art. 1, § 20*

Defendant contends that the warrantless search of the Home "violated the state and federal constitutions" "because the May 11, 2017 warrantless search of [the Home] was neither authorized by North Carolina law nor based on any established exception to the warrant requirement." We must consider the requirements of the

Fourth Amendment and Art. 1, § 20, as applied to PRS supervisees, like Defendant, who are not subject to the search provisions of N.C.G.S. § 15A-1368.4(b1), in order to determine whether DPS, the Commission, or Chief Gibson could lawfully require Defendant to submit to the warrantless and suspicionless search of the Home.

"[W]e start with the 'basic Fourth Amendment principle' that warrantless searches are presumptively unreasonable." *State v. Grady*, 372 N.C. 509, 523–24, 831 S.E.2d 542, 554–55 (2019) (citation omitted). Further, "[i]t is well established that the State bears the burden of proving the reasonableness of a warrantless search." *Id.* at 543, 831 S.E.2d at 568 (citation omitted). As a general principle, "'[t]he Fourth Amendment prohibits only *unreasonable* searches.'" *Id.* at 510, 831 S.E.2d at 546 (quoting *Grady v. North Carolina*, 575 U.S. 306, 310, 191 L. Ed. 2d 459, 462 (2015)). "The reasonableness of a search depends on the totality of the circumstances, including the nature and purpose of the search and the extent to which the search intrudes upon reasonable privacy expectations." *Id.* As noted by our Supreme Court:

> The Fourth Amendment to the United States Constitution and Art. 1, § 20 of the North Carolina Constitution prohibit officers of the law, under ordinary circumstances, from invading the home *except under authority of a search warrant issued in accord with constitutional and statutory provisions.* Further, evidence obtained during an unconstitutional search is inadmissible at trial, not as a rule of evidence, but as a requisite of due process.
>
> A warrantless search is not unconstitutional, however, when (1) probable cause to search exists and (2) the government satisfies its burden of demonstrating that the

exigencies of the situation made search without a warrant imperative. If the circumstances of a particular case render impracticable a delay to obtain a warrant, a warrantless search on probable cause is permissible, because the constitutional proscriptions run only against *unreasonable* searches and seizures.

*State v. Allison*, 298 N.C. 135, 140–41, 257 S.E.2d 417, 421 (1979) (emphasis added)

(citations omitted). In *Grady*, our Supreme Court stated:

> The "basic purpose" of the Fourth Amendment "is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." . . . *[S]ee Schmerber v. California*, 384 U.S. 757, 767 (1966) ("The overriding function of the Fourth Amendment is to protect personal privacy and dignity against unwarranted intrusion by the State."); *see also Riley v. California*, 573 U.S. 373 (2014) ("[T]he Fourth Amendment was the founding generation's response to the reviled 'general warrants' and 'writs of assistance' of the colonial era, which allowed British officers to rummage through homes in an unrestrained search for evidence of criminal activity.").
>
> . . . .
>
> The Supreme Court has explained that "[w]here a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing, . . . reasonableness generally requires the obtaining of a judicial warrant" supported by a showing of probable cause.

*Grady*, 372 N.C. at 523–24, 831 S.E.2d at 554–55 (footnote and some citations

omitted). Moreover,

> "The right of officers to thrust themselves into a home is also a grave concern, not only to the individual but to a society which chooses to dwell in reasonable security and freedom from surveillance. When the right of privacy must

reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, *not by a policeman or government enforcement agent.*"

*Camara v. Mun. Court of City & Cty. of San Francisco*, 387 U.S. 523, 529, 18 L. Ed. 2d 930, 935 (1967) (emphasis added) (citation omitted).

However, "[t]ranslation of the abstract prohibition against 'unreasonable searches and seizures' into workable guidelines for the decision of particular cases is a difficult task which has for many years divided the members of this Court." *Id.* at 528, 18 L. Ed. 2d at 935. The issue in *Camara* involved an appellant who "was awaiting trial on a criminal charge of violating the San Francisco Housing Code by refusing to permit a warrantless inspection of his residence," where the code "'[a]uthorized employees of the City . . ., so far as may be necessary for the performance of their duties, . . . [to] have the right to enter, at reasonable times, any building, structure, or premises in the City to perform any duty imposed upon them by the Municipal Code.'" *Id.* at 525, 526, 18 L. Ed. 2d at 933, 934 (citation omitted). Discussing arguments concerning whether public policy needs outweigh an individual's rights to privacy, the Supreme Court reasoned:

> In our opinion, these arguments unduly discount the purposes behind the warrant machinery contemplated by the Fourth Amendment. Under the present system, when the inspector demands entry, the occupant has no way of knowing . . . the *lawful limits* of the inspector's power to search, and *no way of knowing whether the inspector himself is acting under proper authorization.* These are questions which may be reviewed by a neutral magistrate

*without any reassessment of the basic agency decision* to canvass an area. Yet, *only by refusing entry and risking a criminal conviction* can the occupant at present challenge the inspector's decision to search. And even if the occupant possesses sufficient fortitude to take this risk, as appellant did here, he may never learn any more about the reason for the inspection than that the law generally allows housing inspectors to gain entry. The *practical effect of this system is to leave the occupant subject to the discretion of the official in the field.* This is precisely the discretion to invade private property which *we have consistently circumscribed by a requirement that a disinterested party warrant the need to search.* We simply cannot say that the protections provided by the warrant procedure are not needed in this context; *broad statutory safeguards are no substitute for individualized review,* particularly when those safeguards may *only be invoked at the risk of a criminal penalty.*

*Id.* at 532–33, 18 L. Ed. 2d at 937–38 (emphasis added) (citations omitted); *see also*

*Wyman v. James*, 400 U.S. 309, 316–17, 27 L. Ed. 2d 408, 413 (1971). The Court

noted:

In assessing whether the public interest demands creation of a general exception to the Fourth Amendment's warrant requirement, the question is not whether the public interest justifies the type of search in question, but whether the authority to search should be evidenced by a warrant, which in turn depends in part upon whether the burden of obtaining a warrant is likely to frustrate the governmental purpose behind the search.

*Camara,* 387 U.S. at 533, 18 L. Ed. 2d at 938 (citation omitted).

"It is by now accepted that a parolee, despite a reduced expectation of privacy,

comes within the ambit of the fourth amendment's protection against unreasonable

searches and seizures." *United States v. Bradley*, 571 F.2d 787, 789 n.2 (4th Cir.

1978) (citation omitted). In *Bradley*, the Fourth Circuit applied the rationale used in

*Camara* to the warrantless search of a parolee and adopted "the general rule

announced in *Camara* . . . that warrants are required prior to conducting

administrative searches." *Id.* at 789 (citation omitted). The Court reasoned:

> While parole searches may indeed be analogous to
> administrative searches in that the governmental interest
> in supervision is great and the parolee's privacy interest is
> diminished by the fact of constructive custody, nonetheless
> there is no statutory authorization or guidelines, state or
> federal, to bring the instant case within the [established]
> exception. We therefore conclude that *Camara*, requiring
> as it does prior judicial approval to unconsented searches
> even in the face of reduced privacy interest, is the more
> persuasive authority.

*Id.* at 789–90 (4th Cir. 1978). However, the United States Supreme Court has

concluded that for prisoners who *choose* probation or parole over imprisonment, and

accept the attendant conditions, warrantless searches, if authorized by statute, may

be reasonable even though there has been no prior judicial approval, and even though

the search is conducted without probable cause or reasonable suspicion of unlawful

activity, and no exigent circumstances exist. *Samson v. California*, 547 U.S. 843, 856,

165 L. Ed. 2d 250, 262 (2006).

The State relies heavily on *Samson* in its appellate brief. *Samson* involved the

following facts:

> [Petitioner] was on state parole in California[.] On

> September 6, 2002, Officer Alex Rohleder . . . observed petitioner walking down a street with a woman and a child. . . . Officer Rohleder was aware that petitioner was on parole and believed that he was facing an at-large warrant. . . . . Officer Rohleder confirmed, by radio dispatch, that petitioner was on parole and that he did not have an outstanding warrant. Nevertheless, pursuant to Cal. Penal Code Ann. § 3067(a) and based solely on petitioner's status as a parolee, Officer Rohleder searched petitioner['s person].

*Id.* at 846–47, 165 L. Ed. 2d at 255–56. The petitioner in *Sampson* argued the warrantless search violated the Fourth Amendment even though it was authorized by statute. The Court noted:

> California law provides that every prisoner eligible for release on state parole "shall agree in writing to be subject to search or seizure by a parole officer or other peace officer at any time of the day or night, with or without a search warrant and with or without cause." We granted certiorari to decide whether a suspicionless [and warrantless] search, *conducted under the authority of this statute*, violates the Constitution.

*Id.* at 846, 165 L. Ed. 2d at 255 (emphasis added) (citation omitted). The statute that authorized the search of the parolee's person in *Samson* was Cal. Penal Code § 3067, which stated in part:

> (a) Any inmate who is eligible for release on parole pursuant to this chapter *shall agree in writing to be subject to search* or seizure by a parole officer or other peace officer at any time of the day or night, *with or without a search warrant and with or without cause*.
>
> . . . .

(d) It is not the intent of the Legislature to authorize law enforcement officers to conduct searches for the sole purpose of harassment.

Cal. Penal Code § 3067 (2000) (emphasis added).[2] We note that although Cal. Penal Code § 3067 requires the eligible prisoner to agree to the search condition, that requirement is conditioned on the eligible prisoner choosing parole instead of serving the remainder of the original sentence in prison.

The Court in *Samson* considered all the facts of the case in context, including the specific provisions of the authorizing statute; the great state interest in reducing recidivism in California—which was the highest in the nation at that time; the fact that the petitioner was serving an active prison sentence, that he was given the *choice* to either remain incarcerated until the end of his sentence, or agree to certain terms of parole and serve the remainder of his sentence outside of prison and, by choosing parole, he knowingly and purposefully *accepted its conditions*; and the petitioner's knowledge and acceptance of the warrantless search condition was further demonstrated by the fact that he signed the order granting him parole *in exchange for agreeing to the imposed conditions*. The Court held that the petitioner's reasonable expectation of privacy, for the purpose of his Fourth Amendment challenge, was severely diminished based on the facts and context of his case:

> [T]he parole search condition *under California law*[, which] *requir[es]* inmates who opt for parole to submit to

---

[2] The version of the statute reviewed in *Samson* was amended in 2011. S*ee* 1996 Cal. Legis. Serv. Ch. 868, § 2; 2011 Cal. Legis. Serv. 1st Ex. Sess. Ch. 12, § 25.

[warrantless and] suspicionless searches by a parole officer or other peace officer "at any time," Cal. Penal Code § 3067(a)[,] was "clearly expressed" to petitioner. He signed an order submitting to the condition and thus was "unambiguously" aware of it. *[A]cceptance* of a clear and unambiguous search condition "significantly diminishe[s] [the parolee's] reasonable expectation of privacy." Examining the totality of the circumstances pertaining to petitioner's status as a parolee, "an established variation on imprisonment," including the plain terms of the parole search condition, we conclude that petitioner did not have an expectation of privacy that society would recognize as legitimate.

*Samson*, 547 U.S. at 852, 165 L. Ed. 2d at 259 (emphasis added) (footnote and some

citations omitted). The Court further noted:

"The essence of parole is release from prison, before the completion of sentence, *on the condition* that the prisoner abide by certain rules during the balance of the sentence." "In most cases, *the State is willing to extend parole only because it is able to condition it upon compliance with certain requirements.*"

*Id.* at 850, 165 L. Ed. 2d at 258 (emphasis added) (citations omitted). The Court

explained that the issue before it was "whether California's supervisory *system* is

*drawn* to meet its needs and is reasonable, taking into account a parolee's

substantially diminished expectation of privacy." *Id.* at 855, 165 L. Ed. 2d at 261

(emphasis added) (footnote omitted). The Court held the Fourth Amendment does

not *per se* "prohibit a police officer from conducting a suspicionless search of a parolee"

if the parolee has accepted a specific condition of parole, *authorized by statute*, that

requires the parolee to submit to warrantless searches and safeguards the parolee

from abusive state administration of the condition. *Id.* at 857, 165 L. Ed. 2d at 262; *id.* at 846, 856, 165 L. Ed. 2d at 255, 262. As noted by the Fourth Circuit, in *Samson*, "the Supreme Court [] upheld suspicionless searches of parolees *pursuant to a state statute allowing for such searches.*" *Jones v. Chandrasuwan*, 820 F.3d 685, 692–93 (4th Cir. 2016) (emphasis added) (citation omitted).

The State contends that the present case is analogous to *Samson*, and this Court should therefore affirm the trial court's denial of Defendant's motion to suppress. The State argues that a PRS supervisee, like a parolee or probationer, has a greatly diminished reasonable expectation of privacy because the supervisee remains in the custody of DPS, has been explained the conditions of PRS imposed by the Commission, has agreed to the conditions imposed, and has been released from prison pursuant to the supervisee's acceptance of the conditions imposed. Further, the State contends, the General Assembly has granted the Commission the *statutory authority* to impose as a PRS condition that supervisees "consent" to warrantless searches of their residences—thereby indicating the great public interest in close supervision of PRS supervisees—to reduce recidivism, protect the public, and assist in reintegrative efforts.

Although the constitutionality of a warrantless search must be determined by considering all the circumstances, we do not believe individuals subject to DPS custody, based solely on their statuses as PRS supervisees, parolees, or probationers,

lose *all* reasonable expectations of privacy protected by the Fourth Amendment. Almost every factor considered in *Samson* is inextricably entwined with the status of the petitioner as a parolee, yet the Court did not simply hold that all parolees may be required to submit to warrantless searches, or that every parolee has lost any reasonable expectation of privacy and, therefore, every warrantless search of a parolee is constitutional. The *Samson* Court's reasonableness determination, for both the state's legitimate interests and the parolee's reasonable expectations of privacy, focused on California's specific "system of parole"; whether its statutory basis was such that the imposition of warrantless searches as a condition of parole was reasonable for Fourth Amendment purposes; and, if so, whether the officer who conducted the search did so in compliance with the statutory requirements. *Samson*, 547 U.S. at 851, 165 L. Ed. 2d at 259 (emphasis added) ("California's system of parole is consistent with these observations: A California inmate *may* serve his parole period either *in physical custody*, or *elect* to complete his sentence *out of physical custody* and *subject to certain conditions*. Cal. Penal Code § 3060.5 [].  Under the latter option, an inmate-turned-parolee remains in the legal custody of the California Department of Corrections through the remainder of his term, § 3056, and must comply with all of the terms and conditions of parole[.]").

Defendant argues the State's reliance on *Samson* is misplaced because "the search in *Samson* was conducted in compliance with" specific statutory authority

requiring parole eligible prisoners to agree to warrantless searches of their persons *as a condition precedent* to their release on parole.  We agree that *Samson* does not compel affirming the trial court's order in this case, and hold that no condition of PRS that requires a supervisee to agree to warrantless searches is constitutional, under either our state or federal constitution, absent *express statutory or constitutional authority* granting the Commission the power to impose such a condition.

D.  *Post-Release Supervision – Chapter 15A, Article 84A*

Concerning "North Carolina law," Defendant contends: "Specifically, the search of [the Home] violated [N.C.G.S.] § 15A-1368.4(e)(10)[,]" found in the article governing PRS.  N.C.G.S. § 15A-1368.4 is titled "Conditions of Post-Release Supervision," and the only subsection of N.C.G.S. § 15A-1368.4 that specifically authorized the Commission to impose warrantless searches as a condition of Defendant's PRS was N.C.G.S. § 15A-1368.4(e)(10).[3]  Defendant further argues that, at a minimum, if imposition of random warrantless searches of PRS supervisees as a condition of PRS is to survive Fourth Amendment analysis, the authority for such a condition must be specifically granted by statute—that is, "pursuant to [state law] that itself satisfies the Fourth Amendment reasonableness requirement[.]"  Defendant contends that, because the General Assembly *specifically* addresses searches of PRS supervisees similarly situated to Defendant in N.C.G.S. § 15A-

---

[3] N.C.G.S. § 15A-1368.4(b1), discussed below, does not apply to Defendant.

1368.4(e)(10), subsection (e)(10) provided the *sole* authority granting the Commission

the authority to permit PRS officers to conduct warrantless searches of Defendant as

a condition of his PRS. The relevant part of subsection (e)(10) states:

> Controlling Conditions. – *Appropriate* controlling
> conditions, violation of which may result in revocation of
> post-release supervision, are:
>
> . . . .
>
> Submit at reasonable times to searches of the supervisee's
> *person* by a post-release supervision officer for *purposes
> reasonably related to the post-release supervision.* The
> Commission *shall not require* as a condition of post-release
> supervision that the supervisee submit to any other
> searches that would *otherwise be unlawful.*

N.C.G.S. § 15A-1368.4(e)(10) (emphasis added).

Defendant contends that "the search of [his] home violated [N.C.G.S.] § 15A-

1368.4(e)(10)" because "there are four requirements for a PRS search: (1) the search

must be conducted at 'reasonable times'; (2) the search must be of the 'supervisee's

person'; (3) the search must be conducted by a post-release supervision officer; and,

(4) the search must be 'for purposes reasonably related to the post-release

supervision.'" Because the task force conducting Operation Arrow searched not only

Defendant's "person," but his residence as well, Defendant argues that "requirement"

two was not met, the search of the Home was illegal under North Carolina law, and

it was unconstitutional.

The post-release supervision program was created in the 1993 "Act to Provide for Structured Sentencing" ("Structured Sentencing Act") as Article 84A of Chapter 15A of the North Carolina General Statutes ("Article 84A"). 1993 North Carolina Laws Ch. 538, § 20.1. (H.B. 277). Post-release supervision is defined in Article 84A as:

> The time for which a sentenced prisoner is released from prison before the termination of his *maximum* prison term, *controlled by the rules and conditions of this Article*. Purposes of post-release supervision include all or any of the following: to monitor and control the prisoner in the community, to assist the prisoner in reintegrating into society, to collect restitution and other court indebtedness from the prisoner, and to continue the prisoner's treatment or education.

N.C.G.S. § 15A-1368(a)(1) (emphasis added).

Determinations regarding the imposition or violation of conditions of PRS or parole are made by the Commission, which was created by the Structured Sentencing Act: "There is hereby created a Post-Release Supervision and Parole Commission of the [DAC][4] of the [DPS]." N.C.G.S. § 143B-720(a) (2017); 1993 North Carolina Laws Ch. 538, § 20.1.[5] The "general authority [of the Commission] is described in G.S. 143B-720[.]" N.C.G.S. § 15A-1368(a)(3) (2017). The Commission "shall administer

---

[4] "The functions of [DAC] shall include all functions of the *executive branch* of the State in relation to corrections and the rehabilitation of adult offenders, including detention, parole, and aftercare supervision, and further including those prescribed powers, duties, and functions *enumerated in the laws of this State*." N.C.G.S. § 143B-704(a) (emphasis added).

[5] When the Commission was initially created, this section was found at N.C.G.S. § 143B-266.

post-release supervision as provided in" Article 84A.  N.C.G.S. § 15A-1368(b).  The Commission consists of "four full-time members" "appointed by the Governor[.]" N.C.G.S. § 143B-720(a) and (a2).  Decisions concerning parole are determined by a majority vote of the Commission, however, "a three-member panel of the Commission may set the *terms and conditions* for a post-release supervisee *under G.S. 15A-1368.4* and may decide questions of violations thereunder, *including the issuance of warrants*."  N.C.G.S. § 143B-721(d) (2017).

Although N.C.G.S. § 143B-720 deals primarily with parole, it grants the Commission authority to impose a single specific condition of PRS: "The Commission is authorized and empowered to impose as a condition of parole or post-release supervision that restitution or reparation be made by the prisoner[.]"  N.C.G.S. § 143B-720(d).  Relevant to PRS, N.C.G.S. § 143B-720 also grants the Commission the "authority to revoke and terminate persons on post-release supervision, *as provided in Article 84A* of Chapter 15A of the General Statutes[,]"and "[t]he Commission may accept and review requests from persons placed on probation, parole, or post-release supervision to terminate a mandatory condition of satellite-based monitoring[.]" N.C.G.S. § 143B-720(a) and (e) (emphasis added).

Concerning the Commission's authority to make rules, N.C.G.S. § 143B-720 only grants the Commission "power" "to adopt such rules and regulations, *not inconsistent with the laws of this State*, in accordance with which prisoners eligible

for *parole* consideration may have their cases reviewed and investigated and by which such proceedings may be initiated and considered"; "[a]ll rules and regulations adopted by the Commission [related to granting or denying parole] shall be enforced by the [DAC]." N.C.G.S. § 143B-720(c). No rule-making authority is granted by N.C.G.S. § 143B-720(c) relating to probation or PRS—in fact, no additional rule-making authority is included in N.C.G.S. § 143B-720. A different statute, N.C.G.S. § 143B-702, does give DAC general rule-making authority "related to the conduct, supervision, rights and privileges of persons in its custody or under its supervision[,]" but there is no indication in this general rule-making provision that the General Assembly intended to grant the Commission, DAC, or DPS the authority to make rules allowing the imposition of conditions of PRS not specifically authorized by N.C.G.S. § 15A-1368.4 or to grant the Commission authority to create conditions of PRS that exceed the confines of those statutes.

DPS Policy establishes the rules and obligations of probation/parole/PRS officers (referred to in the Policy as probation/parole officers). Although many of the provisions in the Policy apply to probation, parole, and PRS, the statutory support cited in the Policy for certain rules and procedures is generally limited to statutes from a single article of Chapter 15A—Article 82. For example, the "Joint Law Enforcement Operations" and "Searches" sections of the Manual, which are relevant to the facts of this case, cite N.C.G.S. § 15A-1343(b)(13), concerning probation, but do

not cite N.C.G.S. § 15A-1368.4, which controls conditions of PRS—section 15A-1343(b)(13) *specifically mandates* warrantless searches of *premises* as a condition of *probation*, whereas section N.C.G.S. § 15A-1368.4 contains no specific authority to impose warrantless searches of a supervisee's residence as a condition of PRS, and the specific authority granted in subsection 15A-1368.4(e)(10) is limited to searches of the supervisee's "*person.*"

Article 84A states: "The conditions of post-release supervision are as authorized in G.S. 15A-1368.5." N.C.G.S. § 15A-1368.2(c) (2017). However, this appears to be a typographical error as the conditions of post-release supervision actually appear in N.C.G.S. § 15A-1368.4.[6] Article 84A further states that the commission "*shall* administer post-release supervision *as provided in this Article.*" N.C.G.S. § 15A-1368(b) (emphasis added). Article 84A "applies to all felons sentenced to an active punishment under Article 81B of this Chapter[,]" and therefore applied to Defendant. N.C.G.S. § 15A-1368.1 (2017). "A period of post-release supervision begins on the day the prisoner is released from imprisonment." N.C.G.S. § 15A-1368.5 (2017). N.C.G.S. § 15A-1368.2, "Post-release supervision eligibility and procedure[,]" states: "Except as otherwise provided in this subsection, a prisoner to whom this Article applies *shall* be released from prison for post-release supervision

---

[6] N.C.G.S. § 15A-1368.5 involves "[c]ommencement of post-release supervision" and the application of Article 84A when the defendant has "multiple" convictions, not conditions of PRS. N.C.G.S. § 15A-1368.5 (2017).

on the date equivalent to his maximum imposed prison term less 12 months in the case of Class B1 through E felons and less nine months in the case of Class F through I felons, less any earned time awarded by the [DAC.]"  N.C.G.S. § 15A-1368.2(a) (emphasis added).

Further: "*A prisoner shall not refuse post-release supervision*"—*i.e.*, no prisoner may choose to complete the active sentence imposed for the prisoner's conviction instead of spending the last nine or twelve months of that sentence outside of prison and under the conditions set by the Commission.  N.C.G.S. § 15A-1368.2(b).  There is nothing in Article 84A allowing a prisoner to reject any condition imposed by the Commission, and only the Commission may revoke or modify post-release supervision.  N.C.G.S. § 15A-1368.3(a) and (b).

### E.  *Conditions of PRS – N.C.G.S. § 15A-1368.4*

"In [g]eneral[,] [c]onditions of post-release supervision may be reintegrative in nature or designed to control the supervisee's behavior and to enforce compliance with law or judicial order."  N.C.G.S. § 15A-1368.4(a).  "A supervisee may have his supervision period revoked for any violation of a controlling condition or for repeated violation of a reintegrative condition.  Compliance with reintegrative conditions may entitle a supervisee to earned time credits[.]"  *Id.*  The single generally "*required*" condition of PRS is that the supervisee not commit a crime, and violation of this

condition may result in revocation.[7]  N.C.G.S. § 15A-1368.4(b).  *"Reintegrative"* conditions are directed to helping the supervisee successfully adapt to post-incarceration life.  N.C.G.S. § 15A-1368.4(d)(6).

*"Controlling"* conditions are imposed to help DPS maintain the appropriate level of supervision of the supervisee in order to prevent the supervisee from fleeing, engaging in illegal conduct, or posing an unreasonable danger to the public—as well as ensuring repayment of certain costs or fees.  Controlling conditions include, *inter alia*: not using illegal drugs; not possessing any firearms; reporting to a post-release supervision officer at reasonable times; permitting a post-release supervision officer to visit at reasonable times at the supervisee's home; remaining in one or more specified places for a specified period or periods each day; wearing a device that permits the supervisee's compliance with the conditions to be monitored electronically; complying with a court order to pay court costs and costs for appointed counsel; complying with an order from a court of competent jurisdiction regarding the payment of an obligation of the supervisee in connection with any judgment.  N.C.G.S. § 15A-1368.4(e).  Also included and most relevant to this case is: *"Submit[ting]* at reasonable times to *searches* of the supervisee's *person* by *a post-release supervision officer* for purposes *reasonably related to* the post-release supervision."  N.C.G.S. § 15A-1368.4(e)(10) (emphasis added).  This condition also states: "The Commission

---

[7] For supervisees convicted of certain crimes, additional conditions are required.  N.C.G.S. § 15A-1368.4(b1).

*shall not require* as a condition of post-release supervision that *the supervisee <u>submit</u> <u>to any other searches</u>* that would *otherwise be unlawful.*" *Id.* (emphasis added).

The General Assembly has also included a "catch-all" provision in N.C.G.S. § 15A-1368.4(c), granting the Commission the discretion to impose conditions not specifically authorized in the other subsections of N.C.G.S. § 15A-1368.4. The State argues this "catch-all" provision, N.C.G.S. § 15A-1368.4(c), grants the Commission extraordinary discretion and authority, as no terms in the provision specifically limit the Commission's discretionary powers. We do not agree that the inclusion of a catch-all provision in a statute constitutes a grant of unlimited authority and discretion. It must be considered in the context of the other provisions of the statute, as well as any associated statutes, and the purpose of the statute may also be relevant. Alleged grants of authority to make discretionary decisions affecting an individual's constitutional rights demand particular scrutiny. The appellate courts of this state have discussed the limited nature of the discretion granted to trial courts—and by implication executive commissions—through the inclusion of catch-all provisions:

> North Carolina § 50B-3(a)(13) is a "catch-all" provision which allows the trial court to "[i]nclude *any* additional prohibitions or requirements the court deems necessary to protect any party or any minor child." Our Supreme Court has interpreted the "catch-all" provision of § 50B-3(a)(13) and held that the word "any" does not give the trial court unlimited power to order additional relief. *See State v. Elder*, 368 N.C. 70, 773 S.E.2d 51 (2015).

*Russell v. Wofford*, 260 N.C. App. 88, 92, 816 S.E.2d 909, 912 (2018) (citation omitted).

The catch-all provision in N.C.G.S. § 15A-1368.4 states:

> Discretionary Conditions. – The Commission, *in consultation with the Section of Community Corrections of the Division of Adult Correction and Juvenile Justice*, may impose conditions on a supervisee it believes reasonably necessary to ensure that the supervisee will *lead a law-abiding life or to assist the supervisee to do so*. <u>The Commission may also impose a condition of community service on a supervisee who was a Class F through I felon and who has failed to fully satisfy any order for restitution, reparation, or costs imposed against the supervisee as part of the supervisee's sentence;</u> *however*, <u>the Commission shall not impose such a condition of community service if the Commission determines, upon inquiry, that the supervisee has the financial resources to satisfy the order</u>.

N.C.G.S. § 15A-1368.4(c) (emphasis added). N.C.G.S. § 15A-1368.4(c) is a "catch-all" section, although it also grants the authority to impose the fairly specific condition involving community service, underlined above, its grant is limited to certain specific circumstances. In the underlined portion, the General Assembly demonstrates that it can and will include specific clarifying language when necessary to ensure the Commission understands the limits of its delegated authority. However, we presume the General Assembly did not believe it necessary to clarify that the word "person," as used in N.C.G.S. § 15A-1368.4(e)(10), was not intended to also mean "vehicle" or "premises." Because the State and Defendant disagree on the meaning of certain provisions in Article 84A, we review the relevant statutes.

F. *Statutory Construction*

- 28 -

It is clear that no condition of PRS, whether express or discretionary, may be constitutionally applied if it exceeds the authority granted by the General Assembly, or it violates any provisions of our federal or state constitutions. The State argues that the discretionary condition imposed by the Commission requiring Defendant to submit to warrantless searches of his residence was valid, because N.C.G.S. § 15A-1368.4(c) allows "[t]he Commission, in consultation with the Section of Community Corrections . . . , [to] impose conditions on a supervisee it believes reasonably necessary to ensure that the supervisee will lead a law-abiding life or to assist the supervisee to do so." N.C.G.S. § 15A-1368.4(c). Defendant contends that if the General Assembly intended to grant the Commission the authority to impose as a condition of PRS warrantless searches of a supervisee's residence, it would have done so by an express grant of this authority in N.C.G.S. § 15A-1368.4(e)(10). We agree.

As noted by our Supreme Court: "[I]f the words of a statute are plain and unambiguous, the court need look no further." *Westminster Homes, Inc., v. Town of Cary Zoning Bd. of Adjustment*, 354 N.C. 298, 304, 554 S.E.2d 634, 638 (2001) (citation omitted). However, "if the language is unclear, judicial construction may be required." *Id.*

### 1. **Plain Language**

We first look at the plain language of the contested section of the statute:

As a cardinal principle of statutory interpretation, "[i]f the

- 29 -

> language of the statute is clear and is not ambiguous, we must conclude that the legislature intended the statute to be implemented according to the plain meaning of its terms." *Hyler v. GTE Prods. Co.*, 333 N.C. 258, 262, 425 S.E.2d 698, 701 (1993). Thus, in effectuating legislative intent, it is the duty of the courts to *give effect to the words actually used* in a statute *and not* to delete words used or to *insert words not used*. *N.C. Dep't of Corr. v. N.C. Med. Bd.*, 363 N.C. 189, 201, 675 S.E.2d 641, 649 (2009).

*State v. Watterson*, 198 N.C. App. 500, 505, 679 S.E.2d 897, 900 (2009) (emphasis added). The plain and unambiguous language of N.C.G.S. § 15A-1368.4(e)(10) grants the Commission the *discretionary* authority to impose a condition allowing PRS officers to conduct "*searches*" of a "supervisee's *person*," but nothing else: "Appropriate controlling conditions, violation of which may result in revocation of post-release supervision, [include]: . . . Submit[ting] at reasonable times to searches of the supervisee's *person* by a post-release supervision officer for purposes reasonably related to the post-release supervision." N.C.G.S. § 15A-1368.4(e)(10). There is nothing ambiguous about the language of N.C.G.S. § 15A-1368.4(e)(10). It granted the Commission the authority to require as a condition of PRS that Defendant submit to searches of his person—it did not grant the Commission the authority to extend the reach of this "search condition" to include Defendant's "premises." Nothing in this subsection, nor elsewhere in Article 84A, specifically authorized the Commission to impose a condition of PRS requiring Defendant to submit to *warrantless* searches of his *premises*.

In addition, there is a subsection contained in N.C.G.S. § 15A-1368.4(e) that authorizes the Commission to impose as a condition of PRS that a supervisee must "permit a [PRS] officer to *visit* . . . the supervisee's *home*[.]" N.C.G.S. § 15A-1368.4(e)(6) (emphasis added). This subsection concerns the authority of PRS officers to make visits to supervisees' residences, but that authority is limited to a "visit at reasonable times[,]" and does not include a right to "search" the supervisee's home—other than any "plain-view" "search" the officer may conduct while in areas of the home necessary to conduct the home visit, or areas of the home into which the officer is invited. *Id.* Clearly, N.C.G.S. § 15A-1368.4(e)(6) does not authorize a PRS officer's visit to a supervisee's home to include a warrantless search. This condition serves to alert PRS supervisees that their expectations of privacy cannot reasonably include preventing PRS officers from making "visits" to their premises as part of legitimate PRS duties. In fact, as the "controlling conditions" of N.C.G.S. § 15A-1368.4(e) are not "required conditions," it is presumed that some supervisees in Defendant's position will *not* be subject to home visits or searches of their persons. *Compare with* N.C.G.S. § 15A-1368.4(b) and (b1).

It is "the duty of the courts to give effect to the words actually used in a statute *without . . . insert[ing] words not used.*" *Watterson*, 198 N.C. App. at 505, 679 S.E.2d at 900 (emphasis added) (citation and quotation marks omitted). If the language used is clear, "[t]he intent of the legislature . . . is to be found not in what the legislature

meant to say, but in the meaning of what it did say." *State v. James*, 371 N.C. 77, 86, 813 S.E.2d 195, 203 (2018). A plain language review of N.C.G.S. § 15A-1368.4(e)(10) includes no grant of the authority to impose as a condition of PRS that Defendant submit to warrantless searches of his residence. Therefore, we next look to the "catch-all" provision contained in N.C.G.S. § 15A-1368.4 in order to determine if such authority may be contained therein.

## 2. **The Specific Controls the General**

"'[I]t is a well established principle of statutory construction that a section of a statute dealing with a specific situation controls, with respect to that situation, other sections which are general in their application.'" *Westminster Homes, Inc.*, 354 N.C. at 304, 554 S.E.2d at 638 (citation omitted). As this Court held in an opinion construing a criminal statute where the issue was the element of intent:

> Because the General Assembly *specifically included additional intent provisions in these subsections of the statute, we can presume that it did not intend for courts to impose additional* intent *requirements in the other subsections. See N.C. Dep't of Revenue v. Hudson*, 196 N.C. App., 765, [768], 675 S.E.2d 709, 711 (2009) ("When a legislative body '*includes particular language in one section* of a statute but *omits it in another* section of the same Act, it is *generally presumed that [the legislative body] acts intentionally and purposely in the disparate* inclusion or *exclusion.*'" (quoting *Rodriguez v. United States*, 480 U.S. 522, 525 (1987))).

*Watterson*, 198 N.C. App. at 505–06, 679 S.E.2d at 900 (emphasis added) (citation omitted).

The catch-all provision, N.C.G.S. § 15A-1368.4(c), is by its very nature inherently general—as its intent is to provide the Commission with the discretion to adapt and impose conditions tailored to the particular needs of individual supervisees. We do not believe the General Assembly, by including a catch-all provision, intended to grant the Commission unlimited discretion to impose *any* condition, without restriction—even including conditions that exceed the intrusion into the supervisee's privacy rights expressly granted by the General Assembly in the specific conditions of the statute. We presume the General Assembly considers that a PRS supervisee's reasonable expectations of privacy are significantly diminished when it sets the limits of the powers of the Commission. As this court noted regarding catch-all provisions in Chapters 50B and 50C, citing *State v. Elder*, 368 N.C. 70, 773 S.E.2d 51 (2015), the trial court does "not have 'unfettered discretion to order a broad range of remedies'" simply because it "'believes they are necessary for the protection of any party or child'" nor does it have "'unfettered discretion'" "to order any relief [it] believes necessary[.]" *Russell*, 260 N.C. App. at 94, 816 S.E.2d at 913 (citations omitted). We find this reasoning applicable to the catch-all provision set forth in N.C.G.S. § 15A-1368.4(c)

We hold that by authorizing the Commission to impose a "search" condition in N.C.G.S. § 15A-1368.4(e)(10) that, by its plain language, is limited to a supervisee's "person," the General Assembly thereby intended to foreclose imposition of "search"

conditions pertaining to a supervisee's residence. N.C.G.S. § 15A-1368.4(e)(10) expresses the *limits* of the Commission's authority in that regard, and N.C.G.S. § 15A-1368.4's catch-all provision, subsection 15A-1368.4(c), as a general grant of discretionary authority, cannot serve to expand the specific provisions, authority, and limits, established in N.C.G.S. § 15A-1368.4(e)(10). *See* N.C.G.S. § 15A-1368.4(c) ("Discretionary Conditions.—The Commission, in consultation with the Section of Community Corrections of the Division of Adult Correction and Juvenile Justice, may impose conditions on a supervisee it believes reasonably necessary to ensure that the supervisee will lead a law-abiding life or to assist the supervisee to do so.").[8]

The only "search"-related condition authorized in Article 84A, applicable to Defendant, is the "controlling" condition of N.C.G.S. § 15A-1368.4(e)(10), that specifically allows as a controlling condition that a supervisee "[s]ubmit at reasonable times to searches of the supervisee's *person*[.]" N.C.G.S. § 15A-1368.4(e)(10) (emphasis added). N.C.G.S. § 15A-1368.4(c), the catch-all provision, does not mention searches—whether of a supervisee's person, vehicle, residence, or anything else. Subsection 15A-1368.4(c) is simply a general "catch-all" provision granting the

---

[8] We note that there is no record evidence that the Commission purported to impose the warrantless search condition pursuant to N.C.G.S. § 15A-1368.4(c), that the Commission decided to impose the condition "in consultation with" Community Corrections, nor any record evidence demonstrating that the Commission made a *discretionary* decision based upon Defendant's specific circumstances that this condition was "reasonably necessary to ensure that [Defendant would] lead a law-abiding life or assist [Defendant] to do so." N.C.G.S. § 15A-1368.4(c).

Commission flexibility and discretion to impose reasonable conditions of PRS that are not *already covered* by the specific conditions the General Assembly included in section 15A-1368.4.[9] The General Assembly has demonstrated that it knows how to grant the Commission the extraordinary authority of requiring a supervisee to permit PRS officers to conduct warrantless searches of the supervisee's residence as a condition of PRS, but it did not grant the Commission that extraordinary authority in N.C.G.S. § 15A-1368.4(e). The rules of statutory interpretation compel a determination that the general provisions of N.C.G.S. § 15A-1368.4(c) do not allow imposition of *warrantless* searches of a supervisee's *premises*, when the words "warrantless" and "premises" could have simply been included in the relevant subsection specifically concerning imposition of a "search" requirement as a condition of PRS—N.C.G.S. § 15A-1368.4(e)(10).

### 3. *In Pari Materia*

#### a. N.C.G.S. §§ 15A-1368.4(b1)

As this Court noted in *Russell*, when there is a question concerning the intent of the General Assembly with respect to a particular statutory provision, we look to "similar statutory scheme[s]" in other subsections, sections, or chapters because "it is useful to compare the language of the two Chapters and consider the types of relief

---

[9] We make no holding concerning whether, under N.C.G.S. § 15A-1368.4(c), conditions concerning searches of the person, or clarifying the authority and limits of searches pursuant to N.C.G.S. § 15A-1368.4(e)(10), might violate the Fourth Amendment, and no inferences involving these issues should be made based upon the analysis and holdings in this opinion.

allowed . . . to determine" the intent of the General Assembly and, thereby, the limits of the authority granted. *Russell*, 260 N.C. App. at 91, 816 S.E.2d at 911 (citations omitted). In this case, we first look to another subsection of N.C.G.S. § 15A-1368.4— N.C.G.S. § 15A-1368.4(b1). Comparison of the express language used in N.C.G.S. § 15A-1368.4 subsection (e)(10) with the express language of subsection (b1), convincingly indicates that the General Assembly *intended* to limit "searches" as conditions of PRS pursuant N.C.G.S. § 15A-1368.4(e)(10) to searches of the "person." "'Under the doctrine of *expressio unius est exclusio alterius*, when a statute lists the situations to which it applies, it implies the exclusion of situations not contained in the list.'" *In re Investigation of Death of Eric Miller*, 357 N.C. 316, 325, 584 S.E.2d 772, 780 (2003) (footnote omitted) (citation omitted). This canon applies unless "'a literal interpretation of the language of a statute will lead to absurd results, or contravene the manifest purpose of the Legislature, as otherwise expressed[.]'" *Mazda Motors of Am., Inc., v. Southwestern Motors, Inc.*, 296 N.C. 357, 361, 250 S.E.2d 250, 253 (1979) (citation omitted).

N.C.G.S. § 15A-1368.4(b1) is titled: "Additional Required Conditions for Sex Offenders and Persons Convicted of Offenses Involving Physical, Mental, or Sexual Abuse of a Minor[,]" and it *requires* the Commission to impose the following condition of PRS on supervisees convicted of certain sex crimes or crimes involving the abuse of children: "Submit at reasonable times to <u>*warrantless* searches</u> by a post-release

supervision officer of the supervisee's *person* <u>and</u> of the supervisee's *vehicle* and *premises* . . . for purposes reasonably related to the post-release supervision[.]" N.C.G.S. § 15A-1368.4(b1)(8) (emphasis added). The General Assembly did not include the words "warrantless" or "premises" in the controlling condition applicable to Defendant's PRS, instead it granted the Commission the *limited* authority to include as a condition of Defendant's PRS that Defendant "[s]ubmit at reasonable times to *searches* of [Defendant's] *person*[.]" N.C.G.S. § 15A-1368.4(e)(10) (emphasis added). This Court must consider any "differences in [ ] otherwise identically worded statutes," because these differences in wording "strongly suggest that the General Assembly did not intend" the words included in one statute, or subsection of a statute, to apply to other statutes or subsections that do not include those words. *State v. Watterson*, 198 N.C. App. 500, 506, 679 S.E.2d 897, 901 (2009).

Appellate courts "'presume that the General Assembly would not contradict itself in the same statute[.]'" *State v. James*, 371 N.C. 77, 85, 813 S.E.2d 195, 202 (2018) (citation omitted). Unless giving meaning to every word of N.C.G.S. §§ 15A-1368.4(b1)(8) and 15A-1368.4(e)(10) would lead to absurd results, this Court must presume the General Assembly acted knowingly and with intent when granting the Commission the specific authority to impose "warrantless searches" of both a supervisee's "person" and "premises" as a condition of PRS pursuant to N.C.G.S. § 15A-1368.4(b1)(8) but, pursuant to N.C.G.S. § 15A-1368.4(e)(10), limited the

Commission's authority to impose as a condition of PRS the requirement that a supervisee submit to a "search" to the supervisee's "person." *See State v. White*, 232 N.C. App. 296, 305, 753 S.E.2d 698, 704 (2014); *see also Nance v. S. Ry. Co.*, 149 N.C. 366, 371, 63 S.E. 116, 118 (1908); *State v. Beck*, 359 N.C. 611, 614, 614 S.E.2d 274, 277 (2005).

As there is nothing absurd in the General Assembly allowing the imposition of more rigorous supervision for supervisees it deems, as a class, to require stricter supervision, we cannot ignore the difference in the plain language of the two subsections. *See Beck*, 359 N.C. at 614, 614 S.E.2d at 277. In addition, N.C.G.S. § 15A-1368.4(b1)(8), unlike N.C.G.S. § 15A-1368.4(e)(10), is a *mandatory* condition, indicating the intent of the General Assembly to treat supervisees who have been convicted of certain sex crimes or crimes involving child abuse differently than all other supervisees—who are only *potentially* subject to the discretionary conditions set forth in N.C.G.S. § 15A-1368.4(e)(10).

### b. Articles 82 and 85

A review of the associated sections of Articles 82 and 85 further inform our decision. Article 82 mandates: "As [a] regular condition[ ] of probation, a [probationer] *must:*" "Submit at reasonable times to warrantless searches by a probation officer of the probationer's person . . . *and premises* while the probationer is present, for purposes directly related to the probation supervision, but the

probationer may not be required to submit to any other search that would otherwise be unlawful." N.C.G.S. § 15A-1343(b)(13) (2017) (emphasis added). Article 85 *permits*: "As [a] condition[ ] of parole, the Commission *may* require that the parolee" "[s]ubmit at reasonable times to warrantless searches by a parole officer of the parolee's person . . . *and premises* while the parolee is present, for purposes reasonably related to the parole supervision. The Commission may not require . . . that the parolee submit to any other searches that would otherwise be unlawful." N.C.G.S. § 15A-1374(b)(11) (2017) (emphasis added). We find that the General Assembly's decision to specifically allow, or require, warrantless searches of both the persons *and* the premises of probationers and parolees in N.C.G.S. § 15A-1343(b)(13) and N.C.G.S. § 15A-1374(b)(11), while omitting language in N.C.G.S. §§ 15A-1368.4(e)(10) granting the authority to include as a condition of PRS that supervisees submit to warrantless searches of their premises, demonstrates the intent of the General Assembly to withhold that authority from N.C.G.S. §§ 15A-1368.4(e)(10).

Especially relevant to our review are amendments to the General Statutes made in 2007. Prior to these amendments, N.C.G.S. § 15A-1374(b)(11) did *not* allow warrantless searches of *a parolee's premises* as a condition of parole—its language was nearly identical to that of N.C.G.S. § 15A-1368.4(e)(10). Further, N.C.G.S. § 15A-1368.4(b1) was not part of Article 84A—it did not yet exist. However, in 2007 the

General Assembly made several amendments to the conditions relating to searches

of parolees and PRS supervisees, as follows:

> **SECTION 8**. G.S. 15A-1374(b)(11) reads as rewritten:
>
> (b) Appropriate Conditions. — As conditions of parole, the
> Commission may require that the parolee comply with one
> or more of the following conditions:
>
> (11) Submit at reasonable times to <u>warrantless</u> searches ~~of
> his person~~ by a parole officer <u>of the parolee's person . . . *and*
> *premises* while the parolee is present</u>, for purposes
> reasonably related to ~~his~~ parole supervision. The
> Commission may not require as a condition of parole that
> the parolee submit to any other searches that would
> otherwise be unlawful.

2007 North Carolina Laws 213, § 8 (additions pursuant to the amendment are

underlined, deletions are stricken) (italics added). At the same time, the General

Assembly amended N.C.G.S. § 15A-1368.4 to *add* subsection (b1), including the

requirement that supervisees subject to subsection (b1) "[s]ubmit at reasonable times

to warrantless searches by a post-release supervision officer of the supervisee's

person . . . and premises[.]" 2007 North Carolina Laws 213, § 9. Despite amending

N.C.G.S. § 15A-1374(b)(11) from language identical to that found in N.C.G.S. §

1368.4(e)(10) in all relevant ways, in order to include offenders' "premises" in the

warrantless search condition, and adding subsection (b1) to N.C.G.S. § 1368.4,

subsection (e)(10) of N.C.G.S. § 1368.4 *was not amended*. We presume the General

Assembly acted purposefully and with knowledge, and that its choice not to amend

N.C.G.S. § 1368.4(e)(10) in a similar manner to N.C.G.S. §§ 15A-1374(b)(11) and 1368.4(b1) indicates its intent that PRS supervisees *not* be subject to warrantless searches of their premises unless their convictions subject them to the terms of N.C.G.S. § 1368.4(b1).

4. Searches That Would Otherwise be Unlawful

Finally, N.C.G.S. § 15A-1368.4(e)(10) states: "The Commission shall not require as a condition of post-release supervision that the supervisee submit to *any other searches* that would *otherwise be unlawful*." N.C.G.S. § 15A-1368.4(e)(10) (emphasis added). When read in *pari materia,* the relevant subsections of 15A-1368.4 granted the Commission the authority to require (1) that Defendant allow "a post-release supervision officer to visit at reasonable times at [his] home"; (2) that Defendant "[s]ubmit at reasonable times to searches of [his] *person* by a post-release supervision officer for purposes reasonably related to the post-release supervision";[10] (3) that the Commission, *"in consultation with the Section of Community Corrections of [DAC]*, [could] impose conditions on [Defendant] it believe[d] reasonably necessary to ensure that [Defendant would] lead a law-abiding life or [that would] assist [Defendant] to do so." However, (4) the General Assembly, by plain language included in both of the "search" subsections of the statute, clearly *prohibited* the Commission

---

[10] There is a question if this wording means the search of Defendant's person could be conducted by *any* PRS officer, or only by *his* supervising PRS officer, *i.e.*, Officer Patterson. For the purposes of this appeal only, we will assume without deciding that Chief Gibson qualified as "a post-release supervision officer" under the statute.

from "requiring" as a "condition of [PRS] that [Defendant] submit to *any other searches* that would *otherwise be unlawful*." N.C.G.S. §§ 15A-1368.4(b1)(8), (c), (e)(6), and (e)(10) (emphasis added).

Presuming the Commission intended to impose the discretionary condition that Defendant "[s]ubmit at reasonable times to warrantless searches by a post-release supervision officer of [his] . . . premises while [he was] present, for purposes reasonably related to [Defendant's] post-release supervision"[11] pursuant to N.C.G.S. § 15A-1368.4(c), it was required to do so "in consultation with the Section of Community Corrections of [DAC]," and there is no record evidence that it did so. N.C.G.S. § 15A-1368.4(c).

More relevantly, a condition requiring Defendant to submit to warrantless searches of his residence would constitute a "search[ ] that would otherwise be unlawful." N.C.G.S. § 15A-1368.4(e)(10). A suspicionless warrantless search is in most circumstances a clear violation of the Fourth Amendment. One of the few exceptions recognized by the Supreme Court is when legislation, based on factual circumstances demonstrating a strong and legitimate governmental interest, specifically, and with appropriate limitation, authorizes warrantless searches as a condition for the release from prison of an inmate prior to the termination of the sentence imposed, to which the inmate consents in exchange for release. We hold

---

[11] The quoted language is taken from N.C.G.S. § 15A-1368.4(b1)(8).

that for a warrantless search of a PRS supervisee by a PRS officer to pass constitutional muster, it must be clearly and expressly authorized by statute, or be otherwise lawful—for example, pursuant to arrest or based on probable cause and exigent circumstances. The search of Defendant's residence was not based upon any condition of PRS clearly and expressly authorized by statute, and the catch-all provision of N.C.G.S. § 15A-1368.4(c) cannot make lawful "searches that would otherwise be unlawful." N.C.G.S. §§ 15A-1368.4(e)(10). The General Assembly, by including this language, clearly established that it did *not* intend for N.C.G.S. § 15A-1368.4(c) to provide an avenue for imposing search conditions on PRS supervisees that could not be lawfully imposed pursuant to N.C.G.S. § 15A-1368.4(e)(10) or, if applicable, N.C.G.S. § 15A-1368.4(b1).

## G. *Voluntariness of Defendant's Waiver*

Defendant argues that the trial court erred in concluding that Defendant's waiver of his right to deny the warrantless search of his residence was made voluntarily. We agree.

Defendant argued in his motion to suppress that his constitutional rights were violated by the imposition of any condition requiring him to submit to warrantless searches of his residence. Defendant's motion argued that the Supreme Court, in its opinions holding imposition of conditions requiring warrantless and suspicionless searches, has "relied heavily on each state's statutory scheme for supervising

probationers and parolees." Defendant's motion continues: "In North Carolina, unlike in California[, *see Samson*, 547 U.S. 843, 165 L. Ed. 2d 250], the statutory conditions of post[-]release supervision require only that the post[-]release supervisee 'submit at reasonable times to searches of the supervisee's person by a post[-]release supervision officer for purposes reasonably related to the post[-]release supervision.'" (Citing N.C.G.S. § 15A-1368.4(e)(10)). Defendant further argued in his motion to suppress:

> Additionally, [N.C.G.S. § 15A-1368.4(e)(10) states] "[t]he commission **shall not require** as a condition of post-release supervision that the supervisee submit to any other searches that would otherwise be unlawful." North Carolina law does not require that Defendant be subject to warrantless searches of his residence. Indeed, it specifically protects him from being forced to submit to searches that would otherwise be unlawful. Therefore, any condition of Defendant's post[-]release supervision that would require him to submit to warrantless, suspicionless searches of his home is invalid.

The United States Supreme Court decided analogous issues in *Bumper v. North Carolina*, 391 U.S. 543, 20 L. Ed. 2d 797 (1968). In *Bumper*, "[t]he issue . . . presented [was] whether a search can be justified as lawful on the basis of consent when that 'consent' has been given only after the official conducting the search has asserted that he possesses a warrant"—*i.e.*, proper legal authority. *Id.* at 548, 20 L. Ed. 2d at 802 (footnotes omitted). The Court first noted: "When [the State] seeks to rely upon consent to justify the lawfulness of a search, [it] has the burden of proving

that the consent was, in fact, freely and voluntarily given. *This burden cannot be discharged by showing no more than acquiescence to a <u>claim</u> of lawful authority." Id.* at 548–49, 20 L. Ed. 2d at 802 (emphasis added) (footnotes omitted). The Court further reasoned: "When a law enforcement officer claims authority to search a home under a warrant, [the officer] announces in effect that the occupant *has no right to resist* the search. The situation is instinct with coercion—albeit colorably lawful coercion. *Where there is coercion there cannot be consent." Id.* at 550, 20 L. Ed. 2d at 803 (emphasis added). This logic applies equally when law enforcement officers— whether from a federal law enforcement agency, a police department, a sheriff's office, DPS task force officers, or probation/parole officers—claim authority to search a home under a condition of PRS requiring the supervisee to submit to the search. *See id.* at 549–50, 20 L. Ed. 2d at 802–03. Finally, the Court recognized:

> A search conducted in reliance upon a warrant *cannot* later
> be justified on the basis of consent *if it turns out that the
> warrant was invalid. The result can be no different when*
> it turns out that *the State* does not even attempt to rely
> upon the validity of the warrant, or *fails to show that there
> was, in fact, any warrant at all.*

*Id.* (emphasis added) (footnotes omitted). The *Bumper* Court "h[eld] that there can be no consent under such circumstances." *Id.* at 548, 20 L. Ed. 2d at 802.

Therefore, the State *cannot* prove Defendant effectively waived his Fourth Amendment rights to be free from unreasonable searches if it does not first prove that the execution of the warrantless search of the Home during Operation Arrow *was*

*based upon a valid condition of PRS* authorizing unannounced suspicionless and warrantless searches of Defendant's premises. *Id.*; *see also Lo-Ji Sales, Inc., v. New York*, 442 U.S. 319, 329, 60 L. Ed. 2d 920, 930 (1979) (holding that once an individual is "aware of the presumed authority of the [officer to conduct the] search . . ., his conduct complying with official requests cannot . . . be considered freely and voluntarily given" because "[a]ny 'consent' given in the face of 'colorably lawful coercion' cannot validate" an otherwise illegal search (citation omitted)).

Defendant argues the State failed to meet its burden of producing sufficient evidence supporting the trial court's finding of fact (12): "[D]efendant knowingly, willfully and understandingly consented to the search." Our Supreme Court has held that "[w]hether [a person's] consent is voluntary is to be determined from the totality of the circumstances." *Smith*, 346 N.C. at 798, 488 S.E.2d at 213 (citations omitted). The trial court made the following findings of fact relevant to this argument:

> 1) [D]efendant was placed on post[-]release supervision on April 15th, 2017 and met his [Probation] Officer, Officer Patterson on April 4th, 2017.
>
> 2) Based on Department of Public Safety (DPS) assessments, [D]efendant was considered to be a high[-]risk offender.
>
> 3) Defendant was validated a gang member while in Department of Adult Corrections (DAC).
>
> 4) Based on his security risk assessment and validated gang status [D]efendant was placed in the security risk group [("SRG")] with a high likelihood of re-offending.

5) Because of his status of a high[-]risk offender with a risk assessment of 69 *DPS protocol required* an unannounced search of [Defendant's] residence.

. . . .

7) On May 11, 2017 Officer Patterson, [D]efendant's supervising officer, placed [D]efendant's name on a list of homes to have an unannounced warrantless search.

. . . .

10)   This search was not a random search.  Although there was a large task force targeting *parolees*, [Defendant] was specifically put on the list for a search *because he had not had a thorough home search since his release from prison*.

. . . .

12)   Chief Gibson *advised [D]efendant that [the Operation Arrow task force was] there for a search* and [D]efendant knowingly, willfully and understandingly consented to the search.  There is no evidence before the [trial] court that [Defendant's] consent was given other than voluntary.

(Emphasis added).

"When a trial court conducts a hearing on a motion to suppress, the court 'should make findings of fact that will support its conclusions as to whether the evidence is admissible.'" *Smith*, 346 N.C. at 800, 488 S.E.2d at 214 (citation omitted). The trial court's order does not contain *any express finding* that Defendant was statutorily required to accept the conditions of his PRS.  Further, the record does not

include any documentation stating what Defendant's conditions of PRS were—whether imposed by the Commission or by DPS policy. However, where, as in this case, the trial court's findings of fact do not address all the relevant issues: "'If there is no conflict in the evidence on a fact, failure to find that fact is not error. Its finding is implied from the ruling of the court.'" *Id.* (citation omitted); *see also State v. Powell*, 253 N.C. App. 590, 595 n.1, 800 S.E.2d 745, 749 n.1 (2017) (citations omitted) ("even in cases where there is no material conflict in the evidence presented, 'findings of fact [though not required] are preferred'"). We hold, based upon the testimony of the State's witnesses along with the trial court's findings of fact supported by the evidence, and as a matter of law, that Defendant did not have any legal option *other than to participate in PRS under the conditions as determined by the Commission and DPS policy.*

Finding of fact (12) is undercut by another of the trial court's findings of fact, finding (5), which states: "DPS protocol *required* an unannounced search of [Defendant's] residence." As shown below, finding (5) is supported by the uncontroverted testimony of the State's two witnesses, DPS policy, and the relevant statutes. Contrary to the finding of the trial court, the fact that the 11 May 2017 search was required—Defendant could not refuse the eleven officers of Operation Arrow entry into the premises for the purposes of conducting a thorough warrantless search—constituted "evidence before the [trial] court that [Defendant's] consent was

given other than voluntary." *See Bumper*, 391 U.S. at 548–50, 20 L. Ed. 2d at 802–03. The part of finding (12) stating that "Chief Gibson advised [D]efendant that [the Operation Arrow task force was] there [to conduct a warrantless] search" of Defendant's residence also undercuts the latter portion of finding (12), which concludes "[D]efendant knowingly, willfully and understandingly consented to the search[,]" since Defendant cannot be deemed to have consented to the search when confronted by law enforcement officers stating, under the color of law, that they have the authority to conduct the search without Defendant's consent. *Id.* For these reasons, further supported by the evidence and law discussed below, we hold the trial court erred in finding as fact that "[D]efendant knowingly, willfully and understandingly consented to the search."

### 1. Article 84A

Pursuant to Article 84A, Defendant had no choice but to "consent" to PRS and, therefore, also "consent" to the conditions imposed as a result of his PRS status: "[A] prisoner to whom this Article applies *shall* be released from prison *for post-release supervision* on the date equivalent to his maximum imposed prison term less 12 months in the case of Class B1 through E felons[.]" N.C.G.S. § 15A-1368.2(a) (emphasis added). Further: "A prisoner *shall not refuse* post-release supervision." N.C.G.S. § 15A-1368.2(b) (emphasis added). The General Assembly defines PRS as "[t]he time for which a sentenced prisoner is released from prison before the

termination of his maximum prison term, *controlled by the rules and conditions of this Article*." N.C.G.S. § 15A-1368(a)(1) (2017).

Therefore, the provisions of Article 82 and Article 85 are not applicable to persons on PRS unless Article 84A expressly states otherwise. Further, the "rules and conditions" governing PRS are solely those expressly set forth in Article 84A, absent any specific provisions in the article granting DPS, or its sub-sections such as DAC or the Commission, the authority or duty to adopt rules and guidelines governing PRS and PRS supervisees. In Article 84A, the General Assembly did not grant DPS the authority to make rules governing PRS that deviate materially from what is specifically required or prohibited in the article. N.C.G.S. §§ 15A-1368(a)(3), (b). The only specific grant of authority to adopt rules relating to PRS and PRS supervisees is found in the very last subsection of Article 84A–N.C.G.S. § 15A-1368.6(e), which states: "The Commission shall adopt rules governing the [PRS revocation] hearing." N.C.G.S. § 15A-1368.6(e). DPS is without the authority to impose conditions of PRS, all conditions must be imposed by the Commission.

### 2. DPS Policy

As noted above, DPS sets out its main rules and procedures for supervising PRS supervisees, parolees, and probationers in two policy manuals: the DPS Corrections manual and the DPS Prisons manual, which we refer to together as DPS Policy or simply the Policy. According to DPS Policy: "Newly admitted offenders to

Prisons" must undergo an evaluation or "Risk/Needs Assessment" ("RNA"), "A validated tool used to help identify criminogenic needs, risks and barriers that an offender has which may prevent them from being successful," DPS Prisons, Ch. C, § .0203(c)(5), that includes the same diagnostics, interviews, investigations, and assessments that a PRS supervisee must undergo both prior to release on PRS and as a continuing duty of the supervisee's PRS supervision officer. "This tool identifies the risk for re-arrest and provides" a "service priority level" for the inmate. *Id.* "The results of the tool assist with the creation and continuation of a [case] plan for the inmate's . . . transition back to the community." *Id.* at .1405(b). This process includes using a commercially available statistical diagnostic tool, the "Offender Trait Inventory—Revised" ("OTI-R") to generate the prisoner's security "risk level," primarily based on the inmate's criminal record. The RNA also includes two additional sets of data—a questionnaire completed by the inmate, the "Offender Self Report Questionnaire," and the "Staff Interview and Impressions," which both include specific questions regarding mental health, social history, and anti-social tendencies. *Id.* at .0201(a); .0202(a); .0202(c)(5); .0203(c); .1403(n); .1405(b); DPS Corrections, Ch. C, § .0202. The RNA also includes "evaluat[ing] each case to identify ['gang-related' or] Security Risk Group [SRG] affiliations, crime-related problems, correctional goals, need for outer controls, and other factors relating to the classification process." DPS Prisons, Ch. C, § .0202(a)(4). RNA data, as well as other

case management data, is entered into "[t]he OPUS system[, which] automatically compiles relevant information[.]." *Id.* at .0106(a)(1) and (3).

When the time for an inmate's release on PRS is nearing, the Commission will review the inmate's OPUS file and, after the "Commission has approved the release" and imposed initial PRS conditions, the "release officer" will meet with the inmate to "review the post-release agreement"—which includes a "line-by-line review of all conditions," "read . . . aloud, [and] explain[ed] . . . to the [inmate,]" after which time "the [inmate will] sign the agreement[,]" "to acknowledge awareness and understanding" of the agreement. *Id.* at .0304; .1503(i)(4) and (5). As required by N.C.G.S. § 15A-1368.2(b), DPS policy recognizes that an inmate must participate in PRS: "If the offender attempts to refuse post-release supervision", the release officer must "contact the Post-Release/Parole Supervision Office" to inform it of the refusal. *Id.* at .1503(i)(3).

Prior to release, an inmate will be assigned a PRS supervising officer who will review the inmate's case file and PRS release agreement, which includes the PRS conditions imposed by the Commission. DPS Corrections, Ch. E, § .0303(b)(2). "In the [supervising] officer's discretion, [the officer may] contact the parole case analyst to recommend or request any special supervision conditions." *Id.* at .0303(b)(3). Shortly after release, the supervising officer has to conduct another RNA, which will usually be based upon the same OPUS data collected during the supervisee's

imprisonment, including the OTI-R analysis, but the supervising officer conducts a new, face-to-face, "Staff Interview and Impressions," and has the supervisee fill out a new "Offender Self Report Questionnaire." If the supervisee has scored "50 or higher on the OTI-R," which will have already been determined by the RNA conducted in prison, the supervisee will be considered "high-risk," and the supervising officer will consult with a chief supervising officer "to determine if additional conditions should be implemented[.]" DPS Corrections, Ch. C, § .1003(h).

Further, "Once a[ supervisee] has been identified and validated as a Security risk group (SRG) member, . . . the officer will have the conditions of probation/post-release modified to include the conditions of the Security Risk Group Agreement (SRG-05)." *Id.* at .0503. However: "**A signed copy of the SRG-05 does not give authority to enforce the SRG Agreement. The . . . condition must be added by the . . . Commission.**" *Id.* at .0503 (emphasis in original); *see also id.* at .0307; .0802. Nonetheless, the "Initial Supervision and Contact Requirements" section of the Policy states that supervising officers "*must*" "*[c]onduct a warrantless search of the offender's premises* if . . . the offender is a *validated gang (SRG) member released on post[-]release* or probation[.]" *Id.* at .0504(c)(3) (emphasis added); *see also id.* at .0603. The Policy also states that "[a]n offender's refusal ['to submit to a warrantless search of his/her person, vehicle, and/or premises'] is considered a violation of the

conditions of probation.   [N.C.G.S. §] 15A-1343(b)(13)." *Id.* at .0804.[12]   The Policy

warns: "Note that . . . [a] post-release supervision [supervisee] . . . can neither refuse

nor be denied [PRS release.]"   *Id.* at .1503(i)(3).

Finally, DPS enforces certain conditions, including conducting warrantless

searches, through "Joint Law Enforcement Operations" ("Joint Operations"), which

are operations pairing DPS probation/parole officers "working side-by-side with law

enforcement to enhance the specific objectives of: control, compliance, enforcement,

treatment, and promotion of public safety."   DPS Corrections, Chapter H, § .0502.

The "Target Populations" of these Joint Operations include "high-risk offenders, . . .

SRG offenders, [and] post-release supervision offenders[.]"   *Id.*

### 3.  Testimony of the State's Witnesses

The following testimony of the State's witnesses is relevant to our review of the

order denying Defendant's motion to suppress.   We consider the uncontested

testimony within the context of the relevant law, and DPS policy, as set forth above.

When Officer Patterson was asked during her direct examination to "go

through [her] assessment of [Defendant,]" Officer Patterson testified that she

assessed Defendant as a "high-risk offender" "[d]ue to his criminal history[.]"[13]   When

---

[12] We note that N.C.G.S. § 15A-1343(b)(13), the authority cited, is only applicable to probationers.

[13] At the time of Defendant's PRS, he was a prior record level III, based upon his 14 August 2014 conviction for assault with a deadly weapon with intent to kill, and his 2 August 2016 conviction for possession of marijuana with intent to sell or deliver.

asked "how [she] get[s] to the high[-]risk number[,]" and "[w]hat are the factors you're looking at[,]" Officer Patterson stated: "The factors are criminal history[.]" When asked if criminal history was the only factor, she said, "[c]riminal history and we have an offender self[-]report. How they answer certain questions also can trigger their level as well." However, Officer Patterson then stated that the risk assessment is "computer generated, so [the supervising officers] don't come up with the [risk] number ourselves. [O]nce we plug in everything, then the computer will give us a number"; "[a]t the time that I assessed [Defendant] . . . he assessed as a 69 [risk level]. He was extreme level" "[d]ue to his criminal history."

On cross-examination, Officer Patterson was asked if she had "any paperwork that [she] used to do the[] assessments[,]" and she answered: "Well, as far as the assessment part, his answers we had—it's computerized. So it's on our computer. So he asked—when he comes in, he answers maybe six questions, and it can right then trigger a high-risk offender because of their criminal history. So at that point, his criminal history was already—his score's already triggered through the criminal history once he came out on post[-]release"; Officer Patterson agreed that "it's sort of an automatic thing" and that 'it doesn't really matter what he is doing on post[-]release. What matters for the risk offender is what he had done prior to being placed on post[-]release"—meaning "it's based on criminal history." When asked to provide the "maybe six questions" she asks supervisees as part of an RNA, Officer Patterson

testified that she asks if they can meet their financial obligations, if they have "a drug problem" or "alcohol issues," if they have "ever been married or in a long-term relationship," then stated: "It's two other questions I really cannot remember right now."

Officer Patterson also stated that Defendant was "validated" as a gang member while in prison in 2016, and based upon this "validation" Defendant was required to participate in a "[s]ecurity risk group program" as a "special condition[ ] of his post[-]release per the [C]ommission." She stated that the "security risk group program" is a "program as far as our gang offenders are to participate in." Supervisees assessed as "part of the security risk group" "are subject to a complete . . . unannounced warrantless search" "[f]or the first 90 days[,]" "the conditions as far as the security risk group program, . . . you *have to have an unannounced search*." (Emphasis added). Officer Patterson testified that the "complete unannounced warrantless search" condition was also a condition that was imposed on "pretty much [ ] every . . . probationer and post[-]release" supervisee—that as far as post[-]release . . . those are their conditions as far as that [they] *have to have an unannounced search*." (Emphasis added). When asked to clarify if all PRS supervisees "must" be subjected to "an unannounced search" Officer Patterson answered: "Yes." Officer Patterson testified that Defendant was "aware of the conditions . . . of [his] post[-]release, [including] any special conditions that the [C]ommission has established."

Chief Gibson testified "that prior to May 11th [he] had never had any contact with [Defendant]"; that he "had no firsthand knowledge about [Defendant's] criminal history"; that he "did [ ] not perform . . . th[e] test that Officer Patterson did to get [Defendant's] risk level." The trial court found as fact: "On May 11, 2017 Officer Patterson . . . placed [D]efendant's name on a list of homes to have an unannounced warrantless search." Chief Gibson stated that he spoke with Officer Patterson "prior to going out to the house that day[,]" and Officer Patterson told him that Defendant "was a validated gang member; that he was a high-risk offender; that he was on post[-]release." Chief Gibson testified that Defendant's residence was placed on the list of homes to search as part of Operation Arrow "because of [Defendant's] level. He was OTI score of 69."

Chief Gibson testified that "high-risk offenders" were determined by a numerical risk level generated by the offender's "prior criminal history[,]" "education level, [ ] stability factors such as whether [the offender has] been in a long-term relationship[,]" "whether [the offender] has a GED or not, whether [the offender] has a prior drug history or not," and that these "factors all go into a score that's called offender traits inventory." Neither he nor Officer Patterson testified as to Defendant's status with respect to these personal factors, nor what specific impact Defendant's status had on the calculation of Defendant's risk level, about any recommendations for special conditions he or Officer Patterson made to the

Commission based upon these "factors," nor what conditions of PRS the Commission actually imposed based on these or any other personal traits or facts specific to Defendant—other than his prior criminal record. Chief Gibson testified that the "offender traits inventory" is a "statistically based" algorithm that predicts the likelihood that an "offender"—meaning, according to DPS, a probationer, parolee, or PRS supervisee—will "be re-arrested within the first year of supervision."

Concerning the Operation Arrow Joint Operation task force, Chief Gibson testified that the additional members of the force with him when he initiated contact with Defendant for the purpose of conducting a warrantless search included a DPS canine officer; an Alcohol, Tobacco and Firearms canine officer; a High Point police detective; an officer from the Guilford County Sheriff's Department; two Greensboro police officers; and four additional probation/parole officers—for a total of six federal, state, or municipal "police" officers and five "probation/parole" officers. Therefore, when Chief Gibson informed Defendant that the task force was going to search the Home as part of Operation Arrow, Defendant was facing eleven officers in total, including two canine officers.

Chief Gibson testified that he had not done "any surveillance of [Defendant's] house" prior to the search, that he "didn't see anything in plain view," such as "contraband," before the search was conducted; and that he "did not have a warrant to go in [Defendant's] house." Chief Gibson testified that when he made contact with

Defendant outside the house: "[I] introduced [myself] to [Defendant,]" "I spoke with [Defendant] and identified myself to [Defendant] as Chief Probation Officer Kevin Gibson"; then "I told [Defendant] that *we were there to effect a search pursuant to the terms of his post-release conditions.*" (Emphasis added). Chief Gibson stated that if Defendant had not consented, he "would have notified the parole commission that [Defendant] refused to allow us to effect a search of the residence, and then they possibly could have issued an order for his arrest." Chief Gibson was asked if Defendant was required to submit to the warrantless search of his residence on the basis that Defendant was determined to be a "high-risk offender"; Chief Gibson answered that Defendant was required to submit to the warrantless search of the Home "because [Defendant] has a parole agreement that he signed. It's not solely because of that, but he has a parole agreement that he signed prior to getting out of prison," and Defendant "has several conditions on the parole agreement, and one of them is that he must submit to a warrantless search of his residence, which is also a condition of the security risk group program that he was under as well." Chief Gibson stated: "[Defendant] was *required* as a condition of []his parole *to consent* to this search[.]" (Emphasis added).

Chief Gibson acknowledged that the law *required* Defendant to accept "post-release supervision," Defendant did not have the option to reject PRS and serve the remainder of his active sentence. Chief Gibson acknowledged that Defendant was

required to accept whatever conditions the Commission imposed; that Defendant's participation in "the security risk group program" was not "optional," "it's the law"; and that submission to warrantless searches of his home was also a required condition of Defendant's PRS because it was "a condition of the security risk group program that he was" required to participate in "as well." Chief Gibson also stated that Defendant was placed on the Operation Arrow list for warrantless searches due to his high "OTI" number, which made Defendant a "high-risk offender."

After Chief Gibson "told [Defendant] that we were there to effect a search pursuant to the terms of his post-release conditions, [he] asked [Defendant] for consent to effect that search. And [Defendant] consented to the search." Chief Gibson testified that, *after purportedly obtaining Defendant's consent* to search, "[I] advised [Defendant] that I was going to place him in handcuffs and restraints while we conducted the search, as is our policy. I advised him that he [wa]s not under arrest as a part of that, as well." Defendant was asked to sit on his porch, handcuffed, while a canine officer went through the House to determine whether there were any other people inside. Defendant's uncle and his girlfriend were in the House that morning, Defendant's mother had already left earlier that morning. Officers then thoroughly checked the living room and, once they were satisfied there were no weapons hidden in the couch or nearby, Defendant, his uncle, and his girlfriend, were given the choice of sitting on the couch or waiting outside while the warrantless search was conducted.

All three, Defendant still handcuffed, decided to sit on the couch. Prior to allowing Defendant to take a seat in his residence, while Operation Arrow conducted what the State argues was a consent search of the residence, defendant was "patted down." The task force used the diagram Officer Patterson had drawn of the inside of the House to help prepare for the warrantless search, and Chief Gibson used the diagram to confirm with Defendant the location of Defendant's bedroom.

The trial court's findings and the undisputed testimony of the State's witnesses demonstrate that the Home was searched during Operation Arrow (1) "because [Defendant] had not had a thorough home search since his release from prison[,]" which Officer Patterson testified was a requirement for all supervisees within the first ninety days of beginning PRS; (2) "[b]ecause of [Defendant's] status of a high[-]risk offender[,] . . . DPS protocol required an unannounced search of his residence"; and (3) as found by the trial court, Defendant "was validated a gang member while in Department of Adult Corrections[,]" which meant he was required to participate in the SRG program, and DPS policy required "that he must submit to a warrantless search . . . [as] a condition of the security risk group program that he was under as well." However, DPS policy states: "**A signed copy of the SRG-05 does not give authority to enforce the SRG Agreement. The . . . condition must be added by the . . . Commission.**" DPS Corrections, Ch. C, § .0503 (emphasis in original). DPS policy cannot constitutionally require submission to warrantless searches due

to a supervisee's SRG status, "high-risk" status, or for any other reason. The Policy can only require that a request for such a condition is made to the Commission, and the Commission can only impose conditions based upon valid statutory authority. *Id.*; *id.* at .0204; N.C.G.S. § 15A-1368(b).

DPS policy appears to conflate the Commission's authority to impose warrantless searches as conditions of probation with the Commission's authority to impose warrantless searches as conditions of PRS. The testimonies of Officer Patterson and Chief Gibson indicate they understand DPS policy to mandate imposition of warrantless searches of PRS supervisees' residences under certain circumstances. However, the General Assembly has granted the Commission greater powers with respect to the warrantless searches of probationers and parolees than those granted with respect to the warrantless searches of PRS supervisees. *See* N.C.G.S. §§ 15A-1343(b)(13), 15A-1374(b)(11) and 15A-1368.4(e)(10). Probation, which an offender agrees to in exchange for avoiding imprisonment and may decline if the inmate objects to the conditions, specifically requires warrantless searches of the parolee's residence as a condition. N.C.G.S. § 15A-1343(b)(13). But for PRS, which an inmate may *not* refuse to participate in, no matter what conditions are imposed, the General Assembly withheld from the Commission the authority and discretion to impose warrantless searches of a supervisee's "premises"—unless the supervisee is subject to N.C.G.S. § 15A-1368.4(b1). N.C.G.S. § 15A-1368.4(e)(10)

limits the authority and discretion of the Commission to deciding that a supervisee must "[s]ubmit at reasonable times to searches of the supervisee's *person* by a post-release supervision officer[.]"  N.C.G.S. § 15A-1368.4(e)(10) (emphasis added).

As we have held above, the Commission did not have the authority to impose warrantless searches of the Home as a condition of Defendant's PRS.  This is true whether the Commission purported to act pursuant to N.C.G.S. § 15A-1368.4(c), N.C.G.S. § 15A-1368.4(e)(10), N.C.G.S. § 15A-1343(b)(13), or whether Officer Patterson or Chief Gibson purported to act pursuant to DPS policies regarding offender risk level assessments, validation as a gang member and placement in the SRG program or, as the trial court found, because the supervisee "had not had a thorough home search since his release from prison."

Undoubtedly, Chief Gibson and the Operation Arrow task force believed they had the legal authority to conduct a suspicionless warrantless search of the Home—but they were mistaken.  If "consent" to a search is based upon an officer's belief that the officer has the legal authority to conduct the search, but this belief is mistaken, the purported "consent" is not valid.  *Bumper*, 391 U.S. at 549–50, 20 L. Ed. 2d at 802–03.  The State has failed to demonstrate the existence of any valid condition allowing suspicionless warrantless searches of Defendant's premises.

Further, even had Chief Gibson been in possession of the legal authority to search Defendant's residence, our Supreme Court has held: "When [the State] seeks

to rely upon consent to justify the lawfulness of a search, [it] has the burden of proving that the consent was, in fact, freely and voluntarily given. *This burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority.*" *Id.* at 548, 20 L. Ed. 2d at 802 (emphasis added) (footnotes omitted). For the same reason, Defendant cannot be found to have consented to the terms of his PRS by signing a PRS agreement in prison, or anytime thereafter. Defendant was told, and the law mandates, that he *must* accept PRS and whatever conditions are attached to it. N.C.G.S. § 15A-1368.2(b) ("A prisoner shall not refuse post-release supervision."). Defendant's agreement to abide by the conditions of his PRS was "no more than acquiescence to a claim of lawful authority." *Id.* The law cannot prejudice Defendant for agreeing to something he had no legal right to refuse. The Supreme Court has recognized:

> [W]hen the [officer] demands entry, the occupant has no way of knowing . . . the lawful limits of the [officer]'s power to search, and no way of knowing whether the [officer] himself is acting under proper authorization. . . . . [O]nly by refusing entry and risking a criminal conviction can the occupant at present challenge the [officer]'s decision to search.

*Camara,* 387 U.S. at 532, 18 L. Ed. 2d at 937 (citations omitted). Defendant had no reason to question Chief Gibson's authority to conduct a warrantless search of his residence, as the PRS agreement, which Defendant was by law required to abide by, stated that a chief probation/parole officer in fact did have that authority. Chief

Gibson introduced himself to Defendant, explained who he was and that the Operation Arrow task force was there to effect a search as permitted by Defendant's PRS conditions. Defendant's agreement with Chief Gibson's demand did not constitute "consent" for the purposes of the Fourth Amendment or Art. I § 20 of the North Carolina Constitution. *Bumper*, 391 U.S. at 548, 20 L. Ed. 2d at 802; *see also State v. Weavil*, 59 N.C. App. 708, 710, 297 S.E.2d 772, 774 (1982).

As in *Bumper*, this Court holds Defendant "did not consent to the search, and that it was constitutional error to admit the [fruit of the illegal search] in evidence against [Defendant]. Because the [fruit of the illegal search] was plainly damaging evidence against [Defendant] with respect to . . . the charges against him, its admission at the trial was not harmless error." *Bumper*, 391 U.S. at 550, 20 L. Ed. 2d 797 at 803 (citations omitted).

## III. Conclusion

We hold the trial court erred by denying Defendant's motion to suppress the firearm and other evidence found as the result of the 11 May 2017 warrantless search of the Home. By not including the word "premises" in N.C.G.S. § 15A-1368.4(e)(10), while including the word "premises" in N.C.G.S. § 15A-1368.4(b1) and other closely related statutes, the General Assembly indicated its intent that warrantless search conditions of PRS under N.C.G.S. § 15A-1368.4(e)(10) be limited to searches of the supervisee's "person." The catch-all provision in N.C.G.S. § 15A-1368.4(c) cannot be

used to expand the Commission's authority beyond that which the General Assembly intended and, therefore, cannot serve as authority to impose as a condition of PRS warrantless searches of a supervisee's residence.[14] The Commission therefore erred in imposing that unlawful condition in Defendant's case, and the Operation Arrow warrantless search of Defendant's premises lacked legal authority. Defendant's purported consent did not serve to justify the otherwise unlawful search, as Defendant was obligated by statute to consent to PRS and the conditions imposed. Defendant's compliance with his legal duty, by signing the PRS agreement and not attempting to refuse or hinder Chief Gibson from carrying out one of the conditions contained therein, was not true consent to search as contemplated by the Fourth Amendment or Art. I § 20 of the North Carolina Constitution, and it did not serve to render constitutional the otherwise unconstitutional warrantless search.

Because Operation Arrow conducted an unlawful warrantless search on 11 May 2017, and the firearm and other contraband was discovered as a direct result of that unlawful search, we must reverse the 2 August 2018 order denying Defendant's motion to suppress, and remand for entry of an order granting Defendant's motion to suppress. As the prejudice to Defendant is clear, we vacate the 2 August 2018

---

[14] We do not address whether N.C.G.S. § 15A-1368.4(c) could be used to impose conditions related to warrantless searches of premises for PRS supervisees subject to N.C.G.S. § 15A-1368.4(b1), and we express no opinion on that issue.

judgment entered pursuant to Defendant's *Alford* plea as well, and remand for any additional proceedings not inconsistent with this opinion.

REVERSED IN PART, VACATED IN PART, AND REMANDED.

Judges BRYANT and BROOK concur.